No. 2972.

C. M. ROGERS v. THE STATE.

1. ARSON.—INDICTMENT described the burned building as "the house of Mary Gandy there situate in the town of Granbury, said Hood county, Texas, and the said house being then and there held and occupied by C. M. Rogers for and as the agent of J. M. Rogers, said J. M. Rogers having theretofore, on about the second day of November, 1886, rented and leased said house from the said Mary Gandy by and through J. M. Skipper as the agent of her the said Mary Gandy." The defense excepted to the indictment on the grounds that the description of the house was uncertain, and the averments of its ownership and occupancy uncertain, inconsistent and repugnant. *Held*, that the exceptions were correctly overruled, and that it would have sufficed to have described the building as the house of C. M. Rogers, or a house occupied by C. M. Rogers, situated in the town of Granbury, in Hood county, State of Texas. The averments of the ownership of Mary Gandy and the lease to J. M. Rogers were unnecessary and required the State to prove them, but their redundancy does not vitiate the indictment.

2. OWNERSHIP—EVIDENCE—PRACTICE.—In a trial for arson, the defense objected to the admission of oral evidence adduced by the State to prove the alleged ownership of the burned house, but the objection was overruled and the testimony admitted. It appears, however, that the same fact was proved by other evidence to which no objection was made by the defense, and that the defendant occupied the house under a lease from the owner. *Held*, that, in view of this proof, there was no material error in overruling the objection to the oral proof of the ownership.

3. EVIDENCE—EXPERT TESTIMONY.—In the trial of appellant for the arson of a house wherein he conducted for his father a grain and feed store, it was in proof that he had procured in his father's name an insurance

on the stock to a much larger amount than its value when burned, and a State's witness testified that he was hired by the appellant to burn the house, and did set it on fire, and that the appellant, previous to the fire, told him that he intended to swindle the insurance company, and that he was fixing his books for that purpose and had them nearly ready. Over defendant's objections the State was permitted to produce an account book, and to prove that it was a book used by defendant in his business, and that certain entries therein were in his handwriting, and was then allowed to prove by an expert book keeper the meaning of the entries, which were mercantile and ambiguous. The objections were that neither the purpose nor the date of the entries was proved; that the entries themselves were irrelevant, and that expert evidence is not competent to prove that an entry means one thing when it may mean another or nothing. *Held*, that, in view of the other evidence, there was no error in overruling the objections and admitting the entries and the expert's explanation of them. But *held*, further, that the court below erred in excluding evidence offered by the defendant, which tended to repel the inculpatory inferences deducible from the said entries. (See the opinion for the excluded evidence.)

4. CHARGE OF THE COURT should guard the jury from misapplying evidence which was admitted for a specific purpose only.

APPEAL from the District Court of Hood. Tried below before the Hon. W. H. Devine.

The appellant was convicted as an accomplice to arson, and was awarded a term of five years in the penitentiary.

Homer Duke was the first witness for the State. He testified that he lived in Granbury, Hood county, Texas, and lived there in the year 1887. During April of that year he occupied a room in a building on the north side of the public square. The defendant at that time was keeping a grain and feed store, which was located on the southeast corner of the said square. The witness was awakened one night during the said month by the alarm of fire. As soon as he could he put on his clothes and ran to the defendant's feed store, and found the east door near the end of the house open, and the hay inside of the house on fire. He then ran rapidly to Mr. Smith's house and awakened Mr. Smith, and then went to the church and rang the bell as an alarm. He then went back to the feed store and found Mr. Stringfellow, Gordon and others working at the fire. They then had it nearly extinguished, but were still pouring water on it.

F. J. Gordon was the next witness for the State. He testified that, in April, 1887, he lived in Granbury, Texas, about

forty yards distant from the southeast corner of the public square, which corner was occupied by the defendant's grain and feed store. About midnight on the night of April 16, 1887, the witness heard some person screaming at a point south from his house. Going to his door he discovered that the said feed store was burning. Witness at once dressed and went to the feed store. Stringfellow was then at the east window trying to get in. He smashed the window about the time that the witness reached him, whereupon the witness dashed a few buckets of water on the hay piled near the window on the inside, which was burning. Witness then went to the southeast door and went into the house. No person was in the house when the witness entered it. The witness went for two or three more bucketsful of water, and dashed them on the burning hay before anybody came to his assistance. The smoke finally drove the witness from the inside of the burning house, but, after throwing a few more bucketsful of water into it, he finally got back inside and emptied buckets of water on the burning hay and corn as fast as they were brought to him by the crowds who brought them. George Randall finally got into the house, and in the pile of corn discovered a gallon can of coal oil. That can was covered with corn, which appeared to have rolled down on it. Randall seized the can and took it out of the house, when it was discovered that the heat of the burning matter had melted the spout off of it. The can was quite full of oil. Witness went out of the house after the fire was extinguished and saw an empty gallon can of coal oil sitting near the southeast corner of the house. There was a little cut in that can which appeared to have been made by some person puncturing it with a knife blade. The fire was very hard to extinguish, and the witness thought at the time, from the manner in which the hay and corn burned, and from the strong odor of burning kerosene, that both the hay and corn were saturated with coal oil.

George Randall testified, for the State, that he lived in the town of Granbury at the time, in April, 1887, when the defendant's feed store caught fire. The witness at that time occupied a room in a building on the north side of the public square. He was awakened about two o'clock at night by the alarm of fire. He went at once to the building, about which a large crowd had already gathered. The fire was then under control. Some of the parties were working inside and some on the outside of the house. The witness went inside to assist those struggling with the

flames in there. The smoke inside was very dense, and made the labor very difficult. While shoveling corn from the track of the fire, the witness struck a hard substance with a spade, which, when examined by Henry Evans, proved to be a gallon can of coal oil. There was a hole in the top of said can, but witness could not say whether it had been burned or cut. He saw another can on the outside of the house. It was empty, but had contained coal oil. He did not examine the last mentioned can.

J. A. Stringfellow testified, for the State, that the fire in the defendant's feed store occurred between one and two o'clock on a certain Sunday night in April, 1887. The witness was sleeping about sixty feet distant from the said store, in the rear part of his restaurant, which adjoined the said store. Smith, the man referred to by the witness Duke, was living in the rear of the restaurant. Witness heard the fire alarm, and ran at once to the east or back window of the feed store, from which he pulled some boards, and discovered that the hay on the inside of the house was on fire. Jo. Gordon reached the burning house about the time that witness did. After pouring some water on the burning hay, the witness went back to his room. The witness saw a gallon can full of coal oil in the house, and an empty gallon coal oil can outside. He discovered that the corn inside of the house was saturated with coal oil, but did not observe that the hay was.

Charles Irwin was the next witness for the State. He testified that he was twenty-one years of age. He resided in Granbury in April, 1887, boarding at the house of Captain Farr, where the defendant also boarded at that time. He and defendant occupied the same room in Captain Farr's house, but different beds. The defendant's feed store was set on fire on the night of April 15 or 16, 1887. At that time the witness had known the defendant about three weeks, but had previously seen him in Cleburne. The witness set the said store on fire, having been hired to do so by the defendant, who promised to pay him fifteen or twenty dollars for the job. Defendant spoke to witness, and proposed to pay him to fire the store, about three weeks before it was done. The said proposition was made by the defendant to the witness one night at the Farr hotel, in their said room. At the dinner table on that day he asked the witness if he did not want to make fifteen or twenty dollars. Witness replied that he did, and asked him how it

was to be made.   He replied that he would explain to witness that night, and that night, when they went to their room, he told the witness that he would pay him fifteen or twenty dollars if he would fire the said store.   The witness told him that his proposition involved a very risky undertaking.   Defendant replied that with proper care and caution, the witness could fire the building without danger of detection.   The project to burn the house was reverted to and discussed every night, until the witness agreed to start the fire for a consideration of fifteen or twenty dollars.   On the Saturday preceding the night of the fire, the defendant explained to the witness how to carry out the destruction of the building and contents.   He instructed witness how to saturate the corn, hay and partition wall with coal oil, and how to ignite it.   He then gave the witness a dollar with which to purchase the coal oil.   On that evening, while they were completing their plans for the burning of the store, a negro boy named Alex McCune came into the store, and witness asked defendant if it would do to send Alex to buy the oil.   Defendant replied that it would, and instructed the negro to buy the oil at Skipper's store.   Witness then gave Alex one dollar and five cents, and sent him to Skipper's store to get the oil.   The negro brought back two one gallon cans of coal oil and twenty-five cents in change.   Defendant placed the coal oil under the end of the counter, and witness asked him how much he should pay the negro for going after it.   Defendant replied that a dime was enough. and witness gave Alex ten cents, and kept the remaining fifteen cents.   The negro then left.

It was then arranged between witness and defendant that the defendant should go to Cleburne on that evening, and that the witness should fire the house that night.   It rained, however, and the defendant did not start to Cleburne on that evening, but met the witness at the walking match then in progress in town, and told him to put off the burning of the store, as it was raining.   At the same time he told the witness that he had cut a bale of hay open, and loosened it, and that everything was ready for the fire.   Between six and seven o'clock on the next morning, the witness met the defendant in the alley between a saloon and a store on the south side of the public square, at which time the defendant gave him the key to the store, and directed him, when through with it, to give the key to Charles McGough.   At about eight o'clock the defendant left Granbury

to go to Cleburne. The witness kept the key and went into the store about four o'clock on that evening and emptied one of the cans of oil on the hay and corn. He then left the south door near the east end unbolted, and went out of the front door and locked it, and about half-past seven o'clock that evening took the key and gave it to McGough. Between eleven and twelve o'clock that night, he went back to the store, entered through the unbolted rear door, fired the corn and hay, went out at the rear door, closed or nearly closed it, and went to bed at the hotel, and was in bed when the fire alarm was sounded. While arranging to set fire to the store, the witness saw the defendant writing in a memorandum book, and defendant told him that he was fixing the book to swindle the insurance company; that he wanted to burn the house to get the insurance money, and that he was making entries in his book to make it appear that he had stock on hand sufficient to absorb the amount of his insurance, and that he then had his book nearly ready. The witness cut one of the coal oil cans when he was in the store at four o'clock on the said Sunday evening, and at that time saturated the corn and hay with the oil. The witnesses Jesse Hunter and others were at the hotel dinner table when, about three weeks before the fire, defendant asked witness if he wanted to make fifteen or twenty dollars. When the store was fired it contained corn and hay and some oats and flour.

Cross examined, the witness said that when, three weeks before the fire, the defendant asked him if he wanted to make fifteen or twenty dollars, he and defendant were sitting at the dinner table next to each other, on the west side of the table. Jesse Hunter was sitting at the table, on the same side, and to the right of the witness, but whether immediately next to witness, the witness could not say. The defendant asked that question in a somewhat suppressed tone of voice, and witness was unable to say whether or not any of the persons at the table, other than himself, heard it. Witness did not remember who first suggested the subject when he and defendant went to their room that night, nor did he remember the hour of the night when they discussed it, nor whether they had gone to bed or were yet sitting up. They discussed the matter every Sunday night until the store was fired, but the witness could recall nothing of a particular nature said by defendant about it except that it was his purpose to swindle the insurance company and was fixing his books to show stock on hand equal in value

to the face of his insurance policy.   During the time covered
by the witness's testimony he was engaged in painting for Cap-
tain Farr during the day, and in playing the fiddle at night in
a saloon.   Witness could not say how late he generally stayed
up at night, but he usually found the defendant in the room
when he went to retire.   When Alexander McCune got back to
the defendant's store with the oil, the defendant took the oil
and placed it under the counter.   The witness knew that coal
oil was used by painters in plying their trade, but witness did
not supply either the paints or oils used by him in his work for
Captain Farr.   Everything was supplied him by Captain Farr.
Witness saw McGough about ten o'clock on Sunday morning,
and told him that he had the key to defendant's store, and
would give it to him when he got through with it.   Witness
did not remember that he told McGough that he wanted to use
the key to go into the store to get some of his clothes, though
he may have done so.   Defendant was not in a buggy when he
gave witness the store key on Sunday morning, nor was Elisha
Lott with him at the time.   The witness knew no other reason
than that it was raining why the defendant, at the walking
match, on Saturday night told him to postpone firing of the store.
Witness was arrested on the day after the fire, since which time,
with the exception of a few days when on bail, he had been con-
fined in jail.   While out on bail the witness visited Cleburne,
and while in that town saw and talked with Jo Earle, but he
did not, at that or any other time, tell Jo Earle that defend-
ant did not hire him to burn the house and had nothing to
do with the burning of it; nor did Earle remark to witness that
he had been told that witness had testified that defendant
agreed to pay him money to fire the house, and that he replied
to Earle: "That is a mistake."   Witness was not testifying in
this case under any inducement offered him by the State.   He
expected to be released upon the conviction of the defendant,
but such hope and expectation were not based upon any promise
of immunity made to him by the State.

Alex McCune, colored, testified, for the State, that he was in
defendant's feed store one evening in April, 1887, when Charles
Irwin told him that he wanted him to get him two one gallon
cans of coal oil.   He then gave witness one dollar and five cents
in money, and asked defendant where would be a good place to
get the oil.   Defendant replied that the witness should be sent
to Skipper's store for it.   Witness then went to Skipper's store

and bought two one gallon cans of coal oil, took them back to defendant's store, and gave them to Irwin, who put them under the counter. He also gave Irwin twenty-five cents, which was returned to him as change when he purchased the oil, and Irwin gave him ten cents for going for the oil. This all occurred between three and four o'clock on the evening of the Saturday prior to the Sunday night of the fire. "One of the cans had a hole in it near the thing where the ring went in it on top."

Cross examined, the witness said that when he entered the feed store at the time stated the defendant was sitting at his desk writing and Irwin was standing three or four feet distant from him just at the outside edge of the counter. Defendant was still at his desk writing when Irwin gave witness the money and sent him after the oil, and was similarly situated and engaged when witness got back with the oil. Witness remembered writing a letter to the defendant while he, defendant, was in Cleburne, after the fire, in which he proposed that if defendant would pay him five dollars he would not testify in this case. Defendant never paid him the money demanded, nor any other sum. When witness started to Skipper's after the oil, Irwin asked defendant what would be a reasonable fee to pay witness for going after the oil, and defendant replied that a dime was sufficient.

Mr. Lemaster testified, for the State, that he was clerking in Skipper's store in April, 1887. He remembered that, in the afternoon of the Saturday prior to the fire in defendant's store, the negro Alex McCune came to Skipper's store and purchased two one gallon cans of coal oil. He handed the witness ninety cents in payment, and witness returned him ten cents.

J. M. Skipper testified, for the State, that in April, 1887, the selling price of coal oil at his store was forty cents per gallon. The witness was familiar with the premises in which the defendant kept the feed store, and which was fired one night in April, 1887. That store house belonged to Mrs Mary Gandy, who, before leaving Granbury, some time prior to the fire, constituted the witness her agent to look after and rent the same. About November 1, 1886, the witness, as the agent of the said Mary Gandy, leased the said store house to J. M. Rogers, the father of the defendant, to be occupied by him as a feed store. A feed store was then opened in the said house under the name of J. M. Rogers, but to all appearances was conducted by the

defendant, who paid the rent of the same to witness. The said house was occupied by the defendant, but was leased to J. M. Rogers at the time of the fire.

Charles McGough testified, for the State, that he remembered the fire in the feed store occupied by the defendant. That fire occurred on the night of a certain Sunday in April, 1887. The witness did not know who owned the said store. The witness was frequently in the store, and knew that the business was conducted by the defendant. He, witness, was in charge of the store on the Saturday evening preceding the Sunday night of the fire. His charge of the store on that evening extended from about two o'clock until nearly dark. Witness's said charge amounted to this: The defendant went off to attend a base ball game and asked the witness to keep a watch on the store and serve any customer who might come to purchase supplies, and in that way, from his place in another store, sixty feet distant, the witness looked after the feed store on the said Saturday evening. At about dark on that Saturday evening the said store contained about seventy-five or a hundred bushels of corn, five sacks of flour, eight hides, one sack of oats and a lot of loose hay, the whole of which was worth perhaps one hundred and twenty-five dollars. Later on that evening the defendant told the witness that he was going to Cleburne after the walking match was over, and that he wanted witness to stay in the store until he got back, and that he would leave the key to be delivered to witness. Witness next saw the defendant at the walking match on that night, when he told the witness that he would not go to Cleburne until the next morning, as it was then raining.

Cross examined, the witness said that he saw Charles Irwin on Sunday morning, when Irwin told him that he had the key to defendant's store. Witness asked him for it, and he said that he had to get some clothes out of the said store, after doing which he would give it to witness. He did give the key to witness between seven and eight o'clock on that Sunday evening. Witness saw the defendant unloading something from a wagon at his store on Saturday night, and next morning saw four or five bales of hay in the house.

T. H. Heiner testified, for the State, that he was at the fire and saw five or six bales of burning hay in the house. He saw a can of coal oil taken out of the house on that night, and on the outside of the house saw an empty coal oil can from which

the spout had been cut off. On the next morning the witness took the two said cans to Reichstetter's store and left them there. The house, during the fire, contained between forty and fifty bushels of corn, two sacks of oats and some hay and flour. The fire burned the partition wall in the house, the canvas on the ceiling and some chicken coops.

Jesse Hunter testified, for the State, that the defendant, Charles Irwin and himself were boarders at Farr's hotel in April, 1887. While at the supper table, one evening before the fire, the witness heard the defendant ask Irwin if he did not want to make some money. Irwin, and not defendant, said in reply, "I will see you after supper." No amount of money was specified by defendant, and nothing was said about fifteen or twenty dollars. At this time the witness and defendant were sitting next to each other at the north end of the table, and Irwin was sitting immediately opposite to them.

Eugene Morgan testified, for the State, that he was a clerk in Reichstetter's store at the time of the fire. He was at the fire, and saw two coal oil cans, which, on the next morning, were deposited at Reichstetter's store, where they remained for some time.

J. L. Bates testified, for the State, that he was in Skipper's store on the Saturday evening prior to the fire, when a negro, whom he has since recognized in Alex McCune, came into that store and purchased two one gallon cans of oil. Witness remembered that the negro objected to one of the cans because it had a hole in it. On the morning after the fire the witness saw two coal oil cans at Reichstetter's store, which two cans looked like those the negro bought at Skipper's store. The top was melted from one of those cans when witness saw it in Reichstetter's store.

D. C. Cogdell testified, for the State, that, in November, 1886, the defendant came to the witness and took out a six hundred dollar insurance policy on the stock in the feed store then managed by him. He took the policy in the name of his father, J. M. Rogers. He afterward came to the witness and had the policy changed to include the store fixtures. The policy was placed in Gordon's safe, since when the witness had not seen it.

A. P. Gordon testified, for the State, that at the time of the fire, he was doing business in the house on the extreme southeast corner of the public square, about sixty feet from the feed store which was managed by the defendant. Witness got to

the fire a short time after it started, and found his brother and Stringfellow already there. Hay and corn—principally hay—were then burning. The aggregate value of the contents of the store, which consisted of hay and corn and small quantities of oats and flour, was about one hundred and fifty dollars. The feed store was opened in November, 1886. A short time thereafter the defendant took out a six hundred dollar insurance policy on the stock. He showed the policy to the witness, remarking that he knew little or nothing about insurance. Upon examining the policy, the witness discovered that it did not cover the store fixtures, and suggested to defendant the importance of having it changed to cover the said fixtures. The change was afterwards made in the policy. After that the witness and defendant often talked about insurance. On one occasion the defendant remarked that the feed store was liable to take fire at any time, and asked witness if, in case of it catching fire, would it be likely to fire his, witness's, store. On another occasion he asked witness how much insurance he was carrying, and suggested to him to increase it, as he might be burnt out.

John Reichstetter testified, for the State, that, during the time the defendant kept the feed store in Granbury, he kept his books in the witness's safe, depositing them there every night. The witness was a book keeper, and as such was familiar with the science of book keeping. At this point a "blank" or memorandum book was handed to the witness, which he identified as one of the books used by the defendant in his business, and which he kept in the safe of the witness. The witness was then directed to examine the entries on pages 1, 4 and 6, under the date of April 16, and explain the same. Witness said: "Here, on page 1, I find under the head "Amt. corn bought," an item of date April 16, as follows: 'April 16th. Year, 8645 lbs., $88.00.' This entry represents corn in the ear, bought and received on that day, to the amount of eight thousand six hundred and forty-five pounds at a cost of eighty-eight dollars. Here on page 4, I find under the head 'By hay, acct.,' and under date April 16, this entry: 'April 16, hay, 3000 lbs., 15.00. This represents three thousand pounds of hay received by the house on that day, at a cost of fifteen dollars. Here on page 6, under the head of 'millet,' I find this entry: 'To millet seed, 50 bu., 50.' This represents fifty bushels of millet seed received on that day at a cost of fifty dollars. I do not know who made

these entries nor when they were made, and only speak as an expert book keeper."

Charles McGough, recalled by the State, testified that he knew the book about which the witness Reichstetter had just testified. It was one of the books kept by the defendant in his conduct of his business. The witness had often seen the defendant writing in said book. He was familiar with the hand writing of the defendant, and would say that the entries testified about by Reichstetter were in the defendant's handwriting. The State then introduced the memorandum book in evidence, and rested.

J. M. Rogers, the father of the defendant, was his first witness. He testified that he removed to Cleburne, Johnson county, Texas, from Pike county, Missouri, in the spring of 1886, and had resided in Cleburne ever since. The witness and S. B. Nail were joint proprietors of a grain and feed store in Cleburne, and of another in Granbury from 1886 until February 1, 1887, when witness bought the interest of Nail. From the first, however, the business was conducted in the name of the witness. The branch house in Granbury was opened on November 2, 1886, in the store which witness leased from Mr. J. M. Skipper, and the defendant was placed in charge of it on a salary of twenty-five dollars and board per month. Witness held the house under the said lease at the time of the fire, and the defendant was in possession of the same as clerk and agent of the witness. Witness instructed the defendant to take out a six hundred dollar insurance policy on the stock, and caused him to have it changed afterwards to include the store fixtures. Defendant had no interest whatever in the issuance of the policy. On April 13, 1887, the witness wrote the letter to the defendant, which reads as follows:

CLEBURNE, Texas, April 13, 1887.

*Charlie:*

Yours received. I think mills will start on Monday morning, likely. I will get enough bran to supply my trade, and then, as soon as I can get you a load, will start it over to you with the oats, but hay can't be had at all. My trade have to use bran for hay. I have had four loads of hay this week and it is all gone. I went out in the country yesterday to see if I could get any, but got none. I have bought three loads, to come in this week. We will look for you Sunday. Don't fail to come. All well

and business fair. Ray will be disappointed about coming up Saturday, but will wait until the twenty-sixth. Had a little shower this morning. No more now.

Your Pa.

P. S. Since writing this a man has just come and says he has a quantity of hay to sell. I will send thirty bales of it along with millet seed—get up there Saturday. The corn I bought for you will likely come in Saturday—about one hundred and twenty bushels. Make arrangements to receive it. There is fifty bushels millet seed. You will settle with the parties for the hauling. Below find bill.

About 120 bushels corn, 65 cents; 30 bales hay, 50 cents per 100 pounds; 50 bushels millet seed, $1 per bushel. You will pay 20 cents per 100 pounds freight. The envelope which enclosed this letter was addressed to "Mr. C. M. Rogers, Granbury, Texas," and was postmarked "Cleburne, April 13," and "Granbury, April 14."

Proceeding, the witness testified that he contracted for the corn mentioned in the said letter, on April 13, the same to be delivered to the defendant in Granbury on the following Saturday, at sixty-five cents per bushel, with twenty cents per hundred to be added as freight. The witness did not remember the name of the man with whom he contracted for the said corn, but expected the defendant to pay for it on delivery. The millet referred to in the letter, the witness had in stock in Cleburne, and expected to get it to the defendant in Granbury on the Saturday mentioned, but failed to do so. The hay mentioned in the letter was contracted for by the witness with Mr. John Haley, who lived near Cleburne. The witness did not know whether or not that hay was delivered to defendant at Granbury. On the Sunday morning referred to in the said letter, the defendant came to witness's house in Cleburne in a buggy with Elisha Lott. They arrived about eleven o'clock a. m. Witness heard of the fire in Granbury about dark on Monday night. Defendant returned to Granbury on Tuesday.

Cross examined, the witness said that it was his information that the defendant was arrested as soon as he reached Granbury on Tuesday morning. Witness went to Granbury on Wednesday morning to see about the arrest of the defendant. The witness was unable now to give the name of the man from whom he contracted to buy the corn mentioned in the

letter read in evidence. That man said that he lived about ten miles south of Cleburne. Witness did not pay anything on the contract for the corn, because he expected the defendant to pay for it on receiving it, although he said nothing about that in his letter. The witness did not send the millet to Granbury because he was unable to get wagons to haul it in time to get it there by Saturday. The witness expected his son on Sunday, and concluded not to send the millet until he saw him. He wrote the body of the letter on the morning of the thirteenth, and the postscript in the evening, just before the closing of the mail. Witness did not recollect that he testified on the examining trial that he bought the corn on the twelfth and the hay on the thirteenth. He did not buy the corn at all. He merely contracted for it, to be delivered to the defendant in Granbury.

Jo. Earle testified, for the defense, that, in the fall of 1887, soon after the release of the State's witness Irwin, on bail, he met the said witness on the streets of Cleburne, and got to talking to him about his, Irwin's, previous escape from jail. In the course of that conversation witness remarked to Irwin that he had heard that defendant hired him to burn the store, paying him fifteen or twenty dollars for doing so. Irwin replied: "No, that was a mistake; it was another man."

S. B. Nail was next introduced by the defendant, and testified, as did J. M. Rogers, as to their business connection from the fall of 1886, until he sold out to Rogers on February 1, 1887, and as to the defendant's connection with the business in Granbury. He testified further that the stock on hand when the insurance policy was taken out did not amount to more than two hundred dollars in value, but was immediately increased until the inventory taken in December, 1886, showed it to exceed the value of eight hundred dollars. Its value on February 1, 1887, when witness sold his interest, was in excess of six hundred dollars.

Elisha Lott testified, for the defense, that he lived in Cleburne, and in April, 1887, worked in the livery stable of Willis Souther. On Friday before the fire in Granbury, the witness took a passenger in a buggy from Cleburne to Granbury, and was preparing to start back on the next morning when the defendant came to him and said that he wanted to go to Cleburne late that evening, and that, if witness would wait and take him back in the buggy, he would pay witness's board, livery bill, and a fare

from Granbury to Cleburne. Witness put up his team and waited until evening, when the defendant prevailed on him to wait until after the walking match which was to take place that night. A rain came up after dark, and witness and defendant decided not to start until the next morning. They got up about day break on Sunday morning, and after getting some cold breakfast, witness hitched his team to his buggy. Defendant then got in the buggy with witness and asked him to drive by the house of Charles McGough, with whom he wished to leave his store key. About that time the witness observed Charles Irwin standing in the door of a saloon, and suggested to defendant to send the key to McGough by Irwin. Defendant agreed, and witness drove the buggy to a point in front of the saloon. Defendant then threw the key to Irwin and requested him to give it to McGough as soon as he came down town, and to tell McGough to look out for some grain that might arrive during the day. Irwin took the key, agreeing to do as requested by defendant, and witness and defendant went on to Cleburne, where they arrived about eleven o'clock. En route, and about half way between Cleburne and Granbury, they met some wagons loaded with grain, going towards Granbury, the drivers of which and defendant had some talk. While in Granbury on Saturday, the witness was in defendant's feed store. He went from the hotel, after dinner, to the said store, and remained there until half past one o'clock, when the defendant left to attend a base ball game, and the witness returned to the hotel. Witness did not, while he was at the store in the evening, see anything of Charles Irwin or a negro about the said store. The witness was positive that defendant threw the store key to Irwin from his seat in the buggy; that he did not get out of the buggy, and that he did not go with Irwin into an alley between a saloon and a store and give the key to Irwin.

Cross examined, the witness said that he had never testified in this case before. He supposed that he was in Cleburne at the time of the first trial, but was not sure. He went to Colorado about the time of the said trial, but whether before or after he did not know. Witness had never talked with the defendant about the testimony he intended to give in this case. He had no recollection of talking to Willis Souther, a short time after the arrest of the defendant, or at any other time, at said Souther's stable or elsewhere, in which this case was discussed, and in which talk Souther stated to witness that it was

then current rumor that the defendant had given Charles Irwin ten dollars to burn the store. The witness had no recollection of ever stating to the said Souther that he, witness, could or might have made that ten dollars. If witness ever made such a remark to Souther he made it in fun. Defendant never said a word to witness about firing the store. The witness would now state most positively that he never, at any time or place, told Souther that he knew beforehand that the feed store was going to be fired; that defendant tried to get him to fire it, and that he was out with defendant and Irwin on Saturday night, and saw them get the coal oil and put it under the counter in the store.

The defense rested.

Willis Souther testified, for the State, in rebuttal, that the defense witness Elisha Lott was in his employ as a stable hand in April, 1887. On the Friday before the alleged offense he sent the said Lott in a buggy to take a passenger from Cleburne to Granbury. Lott failed to get back on Saturday, as directed, but returned before noon on Sunday. When asked by witness why he was detained, he said that defendant prevailed on him to defer his departure until Saturday evening, when he would accompany him; that he then prevailed on him to stay over until after night, and by that time it was raining and they deferred their departure until morning. On the day after the defendant's arrest the news was brought to Cleburne that the defendant had paid Irwin ten dollars to fire the feed store. When witness went to his stable he mentioned that report to Lott. Lott replied that "it was just as he expected;" that he knew the store was going to be burned; that he was out with defendant and Irwin nearly all of Saturday night, and knew about the purchase of the oil, and where it was put in the store to be in readiness, and that he could have made that ten dollars himself.

Cross examined, the witness said that he met Lawyer Poindexter at Farr's hotel just before court met this morning, and Poindexter asked him what he was doing in Granbury. He told Poindexter that Lott told him that he could have made that ten dollars. He did not tell Poindexter that that was all that he knew.

A large number of witnesses, residents and officials and ex-officials of Pike county, Missouri, testified, in behalf of defendant, that they had known defendant and his father for many

years, and that up to the time of their removal to Texas, in the spring of 1886, the reputation of the defendant for honesty and fair dealing was excellent, and they did not believe, from what they knew of him and his reputation, that he would incite another to commit arson. The reputation of defendant's father for truth and veracity in Pike county was good.

S. B. Nail and several other citizens of Cleburne, who qualified themselves to speak of the reputation of defendant for honesty, and that of J. M. Rogers for truth and veracity, during their residence in Cleburne, pronounced both to be good.

In the opinion of the court is given the substance of the testimony held to have been erroneously excluded by the court below. According to it, the defendant, when he and Scott met the wagons loaded with produce, directed the teamsters to take the produce to a certain railroad camp near Granbury, and, in case the railroad men did not take all the produce, then to proceed with the remainder to Granbury and deliver it at his, the defendant's, feed store.

*Poindexter & Padelford* and *N. L. Cooper*, for the appellant:
1. The indictment alleged that the house was the property of one Mary Gandy; that she, through her agent J. M. Skipper, leased it to J. M. Rogers, and that appellant C. M. Rogers was in possession thereof as the agent of J. M. Rogers. The sufficiency of these allegations is questioned by the motion to quash. We insist that these allegations of ownership are not only vague, indefinite and uncertain, but that they are absolutely inconsistent, contradictory and repugnant.

In law and for the purposes of this trial, the owner of the house is the one occupying; for the offense is against the occupancy and not against the property. (Tuller v. The State, 8 Texas Ct. App., 504.) The tenant is the party entitled to the possession, and arson is regarded as an offense against the security of the habitation rather than that of the property and true ownership. "But an indictment against an owner, or part owner, for burning his own house, under articles 658-660, Penal Code, must allege ownership in the accused." (Mulligan v. The State, 25 Texas Ct. App., 203.) But the indictment in this case alleges ownership in Mary Gandy; and by this the defendant was informed that Mary Gandy was in possession of the house, for the reason that ownership under the law of arson means possession. (Woodford v. People, 62 New York, 117.) In the

same count this indictment avers that J. M. Rogers was the lessee of Mary Gandy; which would imply that he was at least a part owner and in possession (Mulligan v. The State, 25 Texas Ct. App., 203); and that C. M. Rogers was in possession, which would imply that he was the owner; hence it is not certain from these averments whether the ownership was in the one or the other. But the law is that the ownership must be averred in the person in possession. (Mulligan v. The State, 25 Texas Ct. App., 203; Tuller v. The State, 8 Texas Ct. App., 501; 1 Whart. Cr. Law, 836; 1 Bish. Cr. Law, 577; 2 Bish. Cr. Proc., 37; State v. Toole, 29 Conn., 344; State v. Snider, 26 Mich., 106.) The averments as to ownership must be certain. (1 Whart. Cr. Law, 8 ed., 841.)

In the case of People v. Myers, 20 Cal., 78, the indictment alleged the house to be the property of L. Lemon and the dwelling of one Chinaman. The court, in discussing the sufficiency of these averments, said: "The indictment sets forth in the same count that Lemon is the owner of the dwelling house burned and that it was the dwelling house of a Chinaman whose name is unknown. It is essential that the indictment should show that the building burned is the property of another. (East's Pleas of the Crown, 1034.) And this was so held where the statute, like ours, did not say so in terms. (People v. Gates, 15 Wend., 159.) The allegation of the ownership of the building burned is a part of the description of the offense. It is a general rule of criminal pleading, as well as a provision of our statute, that the indictment must be direct and certain as regards the offense charged. In this indictment, it is altogether uncertain whether the building burned was the dwelling of Lemon or the Chinaman. It may be conjectured that it is intended to assert that the general property was in Lemon and the special property or possession, coupled with an interest, was in the Chinaman. But the meaning of such an averment, if it were admissible to make an averment in this form, can not be left to rest upon conjecture or to be made out by argument. The defendant must be distinctly informed whose dwelling house he is accused of burning, etc. The averment should be direct that the house burned was the property of the person who at the time was occupying it in his own right, for instance, as a tenant."

If the indictment in that case was insufficient, how much stronger are the objections to the indictment in question, which

alleges ownership in Mary Gandy, tenancy in J. M. Rogers, and possession in C. M. Rogers, in the same count. If the case of Tuller v. The State, 8 Texas Court Appeals, 501, and the case of Mulligan v. The State, 25 Texas Court Appeals, 203, are still authority in Texas; if Wharton and Bishop and Greenleaf are worthy to be followed, and if the courts of other States have any weight with the courts of Texas, then the indictment in question is clearly defective and the motion to quash should have been sustained.

2. On the trial the State, over the objection of the defendant, proved by J. M. Skipper that, as he understood it, the house in question was owned by Mary Gandy. This was objected to upon two grounds. First. Because her deed was the proper evidence of her title, and that oral testimony could not be resorted to without accounting for the loss of the deed. Second. Because this testimony was not only oral but that it was purely hearsay. We insist that, if it was proper to allege ownership in the party holding the title, and not in the party in possession or entitled to possession, then proof of title should have been made in the ordinary mode by the introduction of the deed, or by oral testimony after accounting for the loss or nonproduction of the deed in the usual way. But in no event could title in Mary Gandy be established by hearsay testimony, and such was the testimony of J. M. Skipper; for the reason that his statement to the effect that, as he understood it, Mary Gandy was the owner was tantamount to saying that he had heard that she was the owner.

3. On the trial it was proved in the way indicated that Mary Gandy was the owner of the house (there being absolutely no other proof of ownership); that J. M. Rogers was at the time of the fire the lessee of Mary Gandy, and as such lessee was in possession of the house and had a lot of grain, etc., therein; that the business was insured in his name, was conducted in his name and was owned by him exclusively; and that C. M. Rogers (appellant) had no interest whatsoever therein, but was simply in charge of the store as clerk of J. M. Rogers on a salary of twenty-five dollars per month. After the evidence was closed, defendant asked the court to charge the jury in substance that, having alleged ownership in Mary Gandy, the State was bound to sustain this allegation by proof, and that, the proof having failed in this respect and showing conclusively that she was not in possession of the house but that another

was, they should acquit the defendant.    This the court refused, as will appear by the first charge asked by defendant.

"An indictment against an owner or part owner for burning his own house must, under articles 658–660, allege ownership in the accused, and the particular facts which may bring him within the exceptions as amenable to prosecution." (Mulligan v. The State, 25 Texas Ct. App., 203.)    For the purposes of this trial, possession and occupancy constitute ownership (Tuller v. The State, 8 Texas Ct. App., 508), and ownership must be alleged in the person in possession.    (1 Whart. Crim. Law, 836, 837; 3 Greenl. Ev., 54; 2 Bish. Crim. Law, 11; 2 Bish. Crim. Proc., 37; State v. Toole, 29 Conn., 344; State v. Snider, 26 Mich., 106.)

"The averment should be direct that the house burned was the property of the person who at the time was occupying it in his own right, for instance, as a tenant."    (People v. Myers, 20 Cal., 80.)    The State having alleged ownership in Mary Gandy, could that averment be sustained by proof that she was the owner in fee and that J. M. Rogers was holding and therefore a special owner under a lease from J. M. Skipper as agent of Mary Gandy, and the appellant was clerking therein for J. M. Rogers?    We answer no.    "It is the right of present possession *suo jure* at the time of the offense which constitutes the ownership required by the law."    (3 Greenl. Ev., 54.)    Ownership must be proved as alleged.    (3 Greenl. Ev., 51.)    In the case of The State v. Fish, 27 New Jersey Law (3 Dutcher), 335, the defendant was charged with burning a barn of John Dunn.    Upon the trial, the proof showed title in John Dunn, but possession in the defendant Fish.    The defendant was convicted, but upon appeal it was held that the proof did not sustain the allegations of ownership, for the reason that possession constitutes the ownership contemplated by the law, and that, as Fish was in possession, he, and not Dunn, was the owner, and the case was reversed.

In the case of Tuller v. The State, 8 Texas Court of Appeals, 507, in discussing this question, Judge Clark said:  "Our statutes provide that the owner of a house may commit arson by burning it, under certain circumstances, among which is enumerated when there is within it any property belonging to another (or, we will add, when situated in a town or city).  (Penal Code, arts. 658, 659.)    The owner, as herein designated, may be properly regarded as and better styled the occupant; for, as we

have already seen, there may be many other circumstances, not enumerated in the statute, under which the true owner would be liable to conviction for arson, in case he destroyed his own house by wilful burning. A conviction for burning his own house, or a house occupied by the defendant under lease or other contract vesting in him some legal interest, in contradistinction to a naked occupancy, can not, however, be sustained under an indictment alleging the house to be the property of another. Under a general allegation of ownership, as in this case, the conviction must rest alone upon evidence which shows that the alleged owner was in occupation of the premises, or was in fact owner, the premises being unoccupied."

The allegation of ownership is important to enable the defendant to prepare his defense and to plead *antrefois acquit* or *antrefois convict*. And the ownership must be laid in the person in possession, and must be proved as laid. (The State v. Lyon, 12 Conn., 486, and authorities there cited.) "If it turns out in proof that the person named as owner is not in possession, although he may be the owner in fee, a conviction can not be had." (Woodford v. The People, 62 N. Y., 117; 2 Bish. Cr. Proc., 36, 37.)

During the trial the State introduced John Reichstetter, and proved by him that he was a book keeper, and that the defendant kept his books in his safe, and thereupon handed the witness a book, and witness said: "This is one of the books kept in my safe by defendant. The witness was then asked to explain the entries thereon under date of April 16, and the witness was allowed to state that under said date he found, under the head of "By Amount Corn Bought," this entry, viz., "April 16th, 8,645 lb., $88.00," and that this meant that eight thousand six hundred and forty-five pounds, worth eighty-eight dollars, were received on that day; and that he found under head of "By Hay Acct.," this entry, viz., "April 16th, 3,000 lb., $15.00;" and that this meant that three thousand pounds of hay, worth fifteen dollars, were received on that day; that he found this entry under head of "Millet," viz., "April 16th, to millet, 50 bu., $50," and that this meant that fifty bushels of millet were received on that day, worth fifty dollars. At the same time the State placed Charles McGough on the stand and proved by him that the book was one used by defendant in the feed store; that he knew defendant's hand writing, and that in his opinion the entries under date April 16 were in the hand writing of defendant. There-

upon the book with said entries was introduced.   The witness Irwin had testified that defendant had told him at some time before the burning, that he wanted the house burned in order to get the insurance money, and that he had changed his books with the view of showing more stock than he had, etc., and it is presumed that this was the purpose of the State in introducing the above book entries.   Defendant objected to the testimony of John Reichstetter and Charles McGough, and the book entries referred to, upon these grounds, viz:

1.   Because the book was not shown to have been correctly kept, nor was it shown for what purpose it was kept or the entries made, or when they were made.

2.   Because, the book being nameless and the entries meaningless, it was wholly inadmissible and irrevelant, and calculated to prejudice the case of defendant.

3.   Because it was not permissible to allow an expert to testify that an entry meant one thing when it might as well mean another thing or nothing.

The book entries do not show what year they were made in, nor that they were intended to represent that so much grain was received by defendant; yet this expert, John Reichstetter, was permitted to state, without any personal knowlodge of the entries, that they did mean this.   Take the item of corn for instance, it does not show that the corn was bought by the house or from the house; it simply says "by amt. corn bought," yet Reichstetter says this meant that the corn was received.   Turning to the item of millet we find an entry in these words, viz.: "To millet 50 bu., 50."   This would indicate a charge against the house, when the other items of "by corn," "by hay," would indicate a credit; yet the expert testified that all three entries meant the same thing, and that was grain received.   We certainly contend that under no known rule of evidence were the book entries and the opinion of the expert thereon admissible. The book entries being without any meaning or significance whatever, they were inadmissible themselves, and the error in their admission was doubled by allowing John Reichstetter to give to them a meaning which they did not disclose.

5.   The defendant offered to prove by the witness Lott that, on Sunday morning before the fire that night, while in company with defendant on the road from Granbury to Cleburne they met some wagons loaded with grain, and that he heard them tell defendant that they had some corn, etc., for him, and

that defendant told them to deliver it at a railroad camp near Granbury, and that· if they would not take it all to deliver the remainder at the store in Granbury, and that at the same time defendant told him that his father had written him that he would send him certain grain on Saturday, and that he had made a memorandum in one of his books of the items of grain which his father wrote would be there, so that McGough, the party in charge, could see it when the grain came in, etc.

The purpose of Lott's testimony was to show that defendant was expecting grain in on Saturday or Sunday, as stated·in his father's letter, and that he met wagons on Sunday loaded with grain, and thereby account for the memoranda introduced by the State of date April 16; and for the purpose of showing that said entries were intended to represent grain bought but not received. And also for the purpose of rebutting the presumption that defendant was contemplating a fire in the store.

The State had introduced in evidence the entries of date April 16, and having proved by John Reichstetter as an expert the . meaning of these entries, the defendant was entitled to his statement to Lott as tending to explain those entries. The one having been admitted, defendant was entitled to the other under the well known rule that when the State puts in evidence an act of defendant, material to be understood, the defendant is entitled to his declarations explanatory thereof. (Green v. The State, 17 Texas. Ct. App., 395; Stockman v. The State, 24 Texas Ct. App., 387; Davis v. The State, 3 Texas Ct. App., 91.) In this connection we call the attention of the court to the testimony of J. M. Rogers, excluded, and which we think for the same reasons was admissible.

*W. L. Davidson*, Assistant Attorney General, for the State: While it is true that the crime of arson is directed more nearly against the occupancy than the real ownership of and title to the property, still it can not be held to vitiate an indictment that the real facts as to ownership and title are charged in the indictment, together with the facts as to possession of the house. This court has held that ''under our statute the tenant during his lease should be considered only a part owner in the house, and the landlord certainly has a property in it· which the tenant could not destroy with impunity. Still the tenant is the party entitled to the possession, and arson is re-

garded as an offense against the security of the habitation rather than that of the property and true ownership. But an indictment against an owner, or part owner, for burning his own house (articles 658, 659, 660), must allege ownership in the accused, and the particular facts which bring him within the exception as amenable to the prosecution." (Fuller v. State, 8 Texas Ct. App., 501; Willson's Crim. Forms, 411.)

"Appellant being a tenant entitled to occupancy and possession, he was at least a part owner, and occupied such relation to the premises as in our opinion required that the indictment should have alleged the particular facts making him amenable to prosecution for the arson, in case a house has been burnt by him." (Mulligan v. State, 25 Texas Ct. App., 203.)

Whatever may be the attitude of an indictment which charges ownership in the real or special owner, or joint owner, and whatever may be the real status of correct pleading in the event that only one of the joint or part owners is selected out, and so charged as the owner in the indictment, so far as this case is concerned it is immaterial, because all the possible owners, general, special, or joint, are set out by proper averments in the indictment, and every possible ownership and possession is fully averred. The real facts as to ownership and possession are all set out in the indictment fully, and the particular facts making him amenable to prosecution for the arson are charged by proper allegations. (Mulligan v. The State, 25 Texas Ct. App., 203.

The entries made in the book kept by defendant were admissible as showing a motive for the arson. It is fully shown that defendant expected certain hay, millet and corn to be sent by his father to him; that on the sixteenth of April it had not arrived; that he met it on the seventeenth en route to Granbury as he went to Cleburne, and after the arson was perpetrated, and that the entries had already been made, and for a fraudulent purpose. Thus he would not only gain the value of the false entries under his insurance policy, but would gain the actual produce besides, because it had not arrived, nor been housed and stored, as his entries indicated, but was still out on the road. Besides, it is a strong circumstance corroborative of Irwin's testimony.

This being a case of circumstantial evidence to some extent, especially as to the corroboration of Irwin, every fact or circumstance that tended to throw light on the matter under investigation became admissible as evidence. The very reasons

urged for the non admission of the said entries are among the cogent reasons why the same should have been admitted and why the court did not err.

The testimony sought of Lott to prove that defendant, on the morning after the arson, met the wagons en route with produce from Cleburne to Granbury, and directed the teamsters to carry the same to a railroad camp, were only self serving declarations, and were made one or more days after the fraudulent entry in the books, and were not admissible. If admitted, it would only go to strengthen the State's case and to corroborate the testimony of Irwin, and to show the entries to be fraudulent, and made to gain the value of the insurance. It could not explain the entries already made upon any inno- cent theory, nor even tend to do so. The entries showed the produce already received and in store. The stock was increased by those entries, if true, and, had the house burned, the books showed the amounts on hand and their value. Now he directs the teamsters to take the produce they had on their wagons in a different direction, to meet a contract. It had not been in the store house nor had it been received. This being true, it could not affect the books at all, and was irrele- vant and inadmissible.

WILLSON, JUDGE. In the indictment, the house alleged to to have been burned, its ownership and occupancy are de- scribed as follows: "The house of Mary Gandy there situate in the town of Granbury, said Hood county, Texas, and the said house being then and there held and occupied by C. M. Rogers for and as the agent of J. M. Rogers, the said J. M. Rogers having theretofore, on about the second day of Novem- ber, 1886, rented and leased said house from the said Mary Gandy by and though J. M. Skipper as the agent of her the said Mary Gandy."

Defendant excepted to the indictment upon the grounds that the averments descriptive of the house are uncertain, and that the averments as to the ownership and occupancy of the house are uncertain, inconsistent and repugnant. These exceptions were overruled, and this ruling is insisted upon as error by ap- pellant's counsel.

It was not error to overrule the exceptions. There is no un- certainty or repugnancy in the allegations excepted to. It is plain therefrom that Mrs. Gandy was the general owner of the

house; J. M. Rogers was her tenant, and C. M. Rogers his clerk, and the actual occupant. For the purposes of this prosecution it would have been sufficient to have alleged that it was the house of C. M. Rogers, or was a house occupied by C. M. Rogers, situated in the town of Granbury, in Hood county, State of Texas. It was unnecessary to allege the general ownership of Mary Gandy, or the leasing of the house to J. M. Rogers. These unnecessary allegations, however, do not vitiate the indictment, but merely devolve upon the prosecution the burden of proving them. The only defect we perceive in the indictment is that of redundancy, and such defect does not render bad an otherwise good indictment.

II. On the trial the State, over the defendant's objections, was permitted to prove orally, by the witness Skipper, that Mary Gandy was the owner of the house burned. The objections to this testimony were that the ownership of Mary Gandy must be proved by deed or other written evidence of title, and that Skipper's testimony as to her ownership was merely hearsay. It is a sufficient answer to this supposed error to say that the ownership of Mary Gandy of the house in question is sufficiently established by other testimony adduced on the trial without objection on the part of the defendant. Furthermore, it being proved that the defendant occupied the house under a lease from Mary Gandy, he can not be heard to question her ownership of the house. We do not believe it was error to admit the testimony objected to, but, if it was, the error is immaterial in view of other testimony in the case.

It was not error to admit in evidence the entries in defendant's book, and the explanations thereof of the expert, Reichstetter. These entries were proved to be in the hand writing of the defendant, and were in a book used by him in the conduct of his business. The same, and the meaning thereof, were, in view of other evidence in the case, relevant to the issue, and constituted a circumstance which tended to connect the defendant with the commission of the arson, and which corroborated the testimony of the accomplice witness Irwin. They were shown to be false entries, representing that corn, millet and hay had been purchased and received by the defendant into the house immediately preceding the burning of the house. If these articles had, in fact, been in the house when it was destroyed by the fire, they would have been covered by a policy

of insurance held by the father of the defendant, and his father would have been entitled to demand upon said policy their value, amounting to one hundred and fifty-three dollars.

Irwin, the accomplice witness, testified that defendant, shortly before the house was burned, told him that he wanted the house burned in order to get the insurance money, and that he saw defendant writing on his books, and defendant told him he was fixing his bo)ks so as to swindle the insurance company, so as to make it appear that he had as much as the insurance, and that he had his books about ready. As to the explanation of the entries by the expert witness, we think it was competent testimony. Of themselves, the entries, to other than a person skilled in book keeping, might be ambiguous, requiring explanation in order to make certain their precise meaning. It was proper, therefore, to have them explained by an expert in book keeping.

By the witness Elisha Lott the defendant proposed to prove that, on the day the fire occurred and before it occurred, while going from Granbury to Cleburne in company with said witness, they met some wagons loaded with corn, etc., and that defendant had certain conversations with the teamsters, in which the said teamsters said they were taking the produce to Granbury to deliver to defendant; that it was produce that J. M. Rogers, defendant's father, and the owner of the feed store of which defendant had charge, had contracted for to be delivered to defendant; and that defendant directed them what to do with said produce. And he proposed to prove further by said witness that, on the occasion of meeting said wagons, the defendant said to him that the wagons were loaded with produce which his father had directed to be delivered to him at Granbury, and that he had made entries in his memorandum book at Granbury about said produce that would enable McGough, whom defendant had left in charge of the feed store, to understand about the same and to know what to do with the produce. Upon objection made by the State, this proposed testimony was rejected, and defendant excepted.

We are of the opinion that said testimony was competent and should have been admitted. The State had introduced in evidence certain entries found in defendant's book; these entries, unexplained, constitute an inculpatory circumstance, and furnished corroboration of the testimony of the accomplice witness

Irwin.  The rejected testimony tended to explain and to weaken the force of the false entries upon the book, by showing that probably the same had been innocently made; and, furthermore, it was in part corroborative of the testimony of J. M. Rogers, the defendant's father, who testified that he had purchased such produce and had directed the same to be delivered to the defendant at Granbury.   Defendant's declarations to Lott about the entries made upon a memorandum book were admissible, we think, under the provisions of the statute.  (Code Crim. Proc., art. 751; Greene v. The State, 17 Texas Ct. App., 395; Stockman v. The State, 24 Texas Ct. App., 387; Davis v. The State, 3 Texas Ct. App., 91.)

The conversation between defendant and the teamsters with reference to the produce was admissible, we think, for the purpose of showing that the defendant was in fact, before he left Granbury, expecting such produce to be brought to him, and that it was in fact being carried to him, thus rebutting the theory of the State that no such produce had been contracted for, or was to be delivered to the defendant.   Upon the same ground, and for the same purpose, we think the proposed testimony of J. M. Rogers, as set forth in bill of exception No. 5, was relevant and should have been admitted.   While all this rejected testimony may be rather remote and unsatisfactory, still we think it was relevant, and, in view of the character of the testimony relied upon by the State, it might reasonably have influenced the jury favorably to the defendant, and hence it was material error to reject it.

With respect to the charge of the court, when it is considered as a whole, and with reference to the evidence, it is in our opinion not subject to the exceptions reserved to it by the defendant.   With a single exception it is unobjectionable.   The single defect to which we refer is that it fails to instruct the jury to not consider the the testimony introduced by the State for the purpose of discrediting the witness Lott, for any other purpose than that for which it was admitted.   A reference to such impeaching testimony will show the importance and necessity of such an instruction, in view of the peculiar facts of this case.   (Branch v. The State, 15 Texas Ct. App., 96; Barron v. The State, 23 Texas Ct. App., 462; Tucker v. The State, 23 Ct. App., 512.)   In the absence of such an instruction the jury may have considered the statements made by the witness Lott,

as testified to by the impeaching witness, as evidence bearing upon the main issue, and as corroborative of the testimony of the accomplice Irwin; and if it was so considered it must have operated prejudicially to the defendant.

Because of the errors mentioned, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered November 21, 1888.